UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | CRIM. NO. 19-10072-DPW |
| RIGOBERTO RAMIREZ, ) | |
| ) | |
| Defendant ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION TO RECONSIDER PRETRIAL RELEASE ON CONDITIONS BASED ON CHANGED CIRCUMSTANCES AND COVID-19 PANDEMIC

The government respectfully submits its opposition to Defendant Rigoberto Ramirez's ("Ramirez" or "defendant") Emergency Motion to Reconsider Pretrial Release on Conditions Based on Changed Circumstances and COVID-19 Pandemic (the "Motion"). While the government is sympathetic to the public in general and inmates in particular with respect to the dangers inherent in the coronavirus pandemic, the government believes that the defendant both poses a serious danger to the public and that he is a risk of flight such that he should not be released. *See* 18 U.S.C. §§ 3142(f)(1)(A) & (E), 3142 (f)(2)(A). Indeed, because the defendant is charged in Count Thirteen of the superseding indictment with a violation of 18 U.S.C. § 924(c), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(B). Because there has as yet been no detention hearing in this matter, the government begins with the evidence of danger and risk of non-appearance and then addresses the defendant's concerns regarding COVID-19.

BACKGROUND

The defendant is charged in a superseding indictment with eleven counts of Hobbs Hobbs Act robbery, with conspiracy to commit Hobbs Act robbery, and with one count of violating 18

1

U.S.C. § 924(c). The defendant committed these robberies with his uncle, Luis Cintron, who was charged by complaint on March 15, 2018 in the case that ultimately became *United States v. Cintron,* Criminal No. 18-10124-IT (Cintron Case)[1]. The complaint affidavit in the Cintron Case describes 15 armed convenience store robberies that occurred between December 28, 2017 and February 15, 2018, in East Boston and areas north of Boston, including Chelsea, Lynn, Everett, Malden, and Winthrop. *See* Cintron Case Complaint [Docket 4], *passim.* That complaint affidavit is attached as Exhibit A. The defendant ultimately was charged with 10 of those armed robberies, in addition to an eleventh that actually occurred first in time, on December 9, 2017. *See* First Superseding Indictment [Docket 29]. For reasons that will become apparent below, the defendant was not charged with the last few robberies.

The Robberies

The government will not describe in detail the 15 robberies set forth in the complaint affidavit, although the complaint affidavit does provide details regarding each of them. For these purposes it is sufficient to say that the robberies were committed by two-man teams (although not the same two men on each occasion); that the robbers targeted convenience stores in and around the communities indicated above; that they basically were covered from head to foot, including masks that often sported a skeletal design; and that they committed the robberies using a silver gun with a black lower receiver. Exh. A at ¶ 7. During the aftermath of one of the robberies the firearm was discharged: after the robbery of shop Kwik on January 8, 2018 in Lynn, the store clerk chased the robbers out onto the street and the armed robber then fired a shot near the feet of the store clerk, thus demonstrating that it was a real firearm as opposed to a toy gun. *See id.* During an attempted robbery of the N & S Market in Lynn on January 24, 2018, one of the store

---

[1] The defendant was charged separately because by the time he was charged the Cintron Case was ready for trial.

clerks wrestled with the robbers and one of them struck him repeatedly in the head with the gun, resulting in injuries for which he was treated at a local hospital. *See id.* & ¶ 17.

<u>Evidence of the Defendant's Participation</u>

The defendant is charged, under 18 U.S.C. §§ 1951 and 2, with 11 convenience store robberies that occurred between December 9, 2017 and January 24, 2018, as well as with conspiring to commit such robberies between December 2017 and January 2018, in violation of 18 U.S.C. §§ 1951 and 2, and with using and carrying a firearm during and in relation to the Shop Kwik robbery, and possessing a firearm in furtherance of that robbery, in violation of 18 U.S.C. § 924(c)(1)(a)(iii) and 2. Because the firearm was discharged there is a 10-yer mandatory minimum sentence that must be served consecutively to any other sentence.

Without providing all of the evidence showing that the defendant participated in the robberies, the government provides here three categories of evidence that show the case is extremely strong: (1) cell site location information ("CSLI") showing that a cell phone the defendant was using was in the immediate vicinity of a number of the robberies; (2) information from an individual who knows the defendant and has identified him as one of the robbers depicted in the surveillance video from a number of robberies; and (2) information showing the defendant's connection to Cintron, with respect to whom additional evidence exists.

<u>CSLI</u>[2]

Attached as Exhibit B is a portion of an expert witness summary that was filed in the Cintron Case when the case was about to proceed to trial, including evidence the government was intending to introduce with respect to CSLI.. Again, the government will not recount all of the

---

[2] The defendant's motion to exclude CSLI evidence relating to the phones he was using is under advisement by the district court.

details contained in Exhibit B but rather will provide the highlights ("CSLI Summary").[3]  Briefly, a cell phone is constantly scanning for the cell tower with the cleanest and clearest signal it can detect, which often (but not always) is from the tower closest to the phone.  *See* CSLI summary.  A cell phone will choose that signal when making or receiving a call.  *Id.*  Cell phone companies retain records for varying periods of time that reveal the cell tower to which a cell phone connected when being aused.  *Id.*  The records are created only when a cell phone is actively being used; thus, a phone can be near to a tower but will not generate a record unless it is in active use, as when a call is made or received.  *Id.*  The government obtained such records for two cell phones, one ending in 5761 which, according to the complaint, was being used by the defendant at the time (the "Defendant's Phone"), and one ending in 5079 which, according to the complaint, was being used by Cintron at the time (the "Cintron Phone").  *Id.*; *see also* Complaint ¶¶ 12-29.  The Defendant's Phone was activated until the end of December 2017.  The evidence shows that, of the eight robberies with which the defendant is charged that occurred beginning in January, the defendant's phone connected to the cell tower closest to the robbery on five occasions.  *Id.*  0f the 15 robberies charged in the complaint, Cintron's Phone connected to the tower closest to the robbery on eight occasions.  *Id.*  The government believes that the last robbery the defendant participated in was on January 24, 2018, and he is thus not charged with any of the robberies that occurred thereafter.  *See* Superseding Indictment.

### The Witness

On December 20, 2019, the government filed an assented-to motion for a protective order regarding a person referred to as the "Witness," [Docket 45], and on December 27, 2019, the Court allowed the motion [Docket 48].   In essence, the government indicated that the Witness has

---

[3] The CLSI Summary is redacted, not out of a concern for the content of the redacted material, but simply to focus on the part of the document containing the relevant information.

a significant criminal history and, should he become incarcerated, could be subject to physical harm, intimidation, or threats were his role in this matter to become known, and that thus, while the defendant should be permitted to view materials that did not have identifying information regarding the Witness obscured, the discovery with which he was provided in hard copy would have that information redacted. Out of continued concern for the Witness's safety, the government provides herein a general proffer of part of the information provided by the Witness in order to avoid disclosing information that might serve to identify the Witness.

      The Witness indicated that he knows the defendant, as well as Cintron. In late 2017 he was helping the defendant and Cintron package drugs for sale. The defendant told him that he had been robbing stores and asked the Witness, on more than one occasion, to participate in future robberies. The defendant told the Witness that it would be safe because they had a gun. The defendant told the Witness over time about some of the robberies they committed, including a robbery in which a store clerk chased the robbers onto the street and the robber with the gun fired it at the clerk's feet, and another occasion on which someone in the store tried to grab the gun and the defendant punched him. The Witness viewed surveillance video or images from a number of robberies and, based on body shape and size, clothing, and/or manner of movement identified the defendant as one of the robbers in the December 9, 2017 robbery; one of the robbers in the first December 28, 2017 robbery (and Cintron as one of the robbers in the second); one of the robbers in the first January 2, 2018 robberies (and Cintron as one of the robbers in the second); as one of the robbers in the first January 17, 2018 robbery; and as the would-be robber who struck the store employee in the attempted robbery on January 17, 2018. The Witness identified Cintron as one of the robbers in each of the robberies on January 24, 2018. (The Witness indicated that he did not know who either of the robbers was in either of the January 8, 2018 robberies, including the one in which the gun was discharged outside.)

Relationship to Cintron

As the Complaint indicates, Cintron is the defendant's uncle, and the two of them had a significant relationship during the relevant period. *See* Complaint at ¶ 27. Strong evidence exists that Cintron had the use of two rental cars that were used in at least some of the robberies. Complaint ¶¶ 25-26. In particular, the clerk who chased the robbers out of the store on January 8, 2018 and was shot at saw them get into a silver Murano that had an additional three people already inside it. Complaint ¶ 14. The Lynn Police recovered a spent shell casing at the scene with an unusual head stamp: "HRTRS 9mm Luger." *Id.* When the FBI located the vehicle, which by then had been rented to a new customer, they recovered from under a floor mat a live round of ammunition with the same head stamp. *Id.* ¶ 25. This evidence, in addition to further establishing Cintron's involvement in the robberies, shows that others were present in the vehicle even though neither the defendant nor Cintron went into the stores as one of the two robbers that night.

In addition, as noted previously, Cintron has been identified by the Witness in a number of the robberies and the Cintron Phone connected to the cell tower nearest the robbery on eight of 15 occasions (and was inactive on the other occasions). *See* CSLI summary.

Again, the foregoing is not intended to present all of the evidence against the defendant but simply to show that the case against him is extremely strong.

The Defendant's Conduct While on Supervised Release

At the time the defendant was participating in these armed robberies, he was on federal supervised release. Specifically, he was convicted in *United States v. Rigoberto Ramirez,* Criminal No. 10-10008-WGY, of conspiracy to distribute cocaine base and two counts of distribution of cocaine base. He was sentenced to 13 years, later resentenced to 12 years, and ultimately resentenced again to time served. [Docket *passim*]. After the defendant's release from federal prison, the court entered judgment on July 29, 2016 and sentenced the defendant to a year

6

and a day in prison for (very quickly) violating the terms of his supervised release. [Docket 173]. The defendant was arrested for another supervised release violation on September 12, 2017, and the court allowed a motion to continue the final revocation hearing to January 9, 2018, so that the defendant could participate in a residential drug treatment program. [Docket 200, 202, 203]. The defendant completed the Miller House program on December 4, 2017. [Docket 204].

Five days later, the defendant participated in an armed Hobbs Act robbery, and participated in at least 10 more such robberies until ultimately he ended up back in federal custody on March 5, 2018, having previously appeared and been held in Chelsea District Court on February 5, 2018 on a drug possession charge. *Commonwealth v. Ramirez,* 1814CR00092.

Criminal History

According to the Presentence Report ("PSR") prepared for the federal drug case, the defendant was convicted in Chelsea District Court on October 7, 1991 of possession of a class B substance, for which he received a sentence of two and a half years with 90 days to serve and the remainder suspended. PSR ¶ 47. His probation was revoked on May 8, 1992, and he was sentenced to serve the remaining 27 months. *Id.* He was convicted in the same court on the same date of essentially the same crime with the same result. PSR ¶ 48.

On April 8, 1993, the defendant was convicted in the Chelsea District Court Jury of Six of distribution of a class A substance in a drug-free zone and was sentenced to two years. PSR ¶ 51.

The defendant was convicted on April 22, 1994 in Cambridge District Court of threatening and witness intimidation and was sentenced to six months in jail. PSR ¶ 94.

On March 4, 1997 the defendant was convicted in Quincy District Court of armed robbery and was sentenced to five years of probation. PSR ¶ 54.

On October 10, 1997, the defendant was convicted in the 9th Circuit Court of Kissimmee, Florida, of several offenses: attempting to purchase heroin; four counts of burglary of a dwelling

or occupied conveyance; dealing in stolen property; and grand theft of over $300 but less than $20,000. PSR ¶¶ 56-62. While not entirely clear, it appears that the defendant was initially sentenced to 11 years on these charges but the sentence was deemed illegal and the defendant was resentenced on February 17, 2006 to 40.75 months. *Id.*

The defendant also was charged with and convicted of several drug possession charges over the years. PSR, *passim.*

### Guidelines

Assuming conservatively that the defendant has a criminal history category of III and a Combined Offense Level of 27 for the robberies,[4] the defendant's sentencing range after trial is 87-108 months, plus 10 years at either end for the § 924(c) count in which the gun was discharged. On a plea the range is 63 to 78 months, plus the same 10 years at either end. Thus, the low end of the range after trial is 207 months and the low end on a plea is 183 months.

### Danger

In light of the foregoing, the danger the defendant poses to the community is manifest. He committed 11 serious violent felonies while under active supervision by the U.S. Probation Office. All of them were armed. The evidence shows that, although the defendant was not always one of the two robbers in the store, on a number of occasions he was. He also has been identified as the person who beat the only victim who suffered physical injury during any of the robberies.

The evidence also shows the defendant to be a danger to at least one person: the Witness.

---

[4] Robbery has a base offense level of 20. USSG § 2B3.1(a). Two levels are added to the robbery in which the clerk was beaten. USSG § 2B3.1(b)(3)(A). There is no enhancement for use of the gun in light of the § 924(c) charge. Because robberies do not "group" one looks to USSG § 3D1.4 to determine the Combined Offense Level. Here, because the group with the highest offense level is the group with the injury and the offense level is 22, and because there are 10 more groups within 4 levels as serious, the defendant "maxes out" under the table and the Combined Offense Level is achieved by adding 5 to 22, for a total of 27.

Although efforts have been made to safeguard the safety of the Witness, the defendant knows who it is. While old, the defendant has a conviction for witness intimidation. There is a significant risk that the defendant will take steps to threaten, intimidate, or harm the Witness if he is released.

### Risk of Flight

The defendant, who finished a federal supervised release sentence right before he was arrested for this case in early 2019, is now facing serious time under the Guidelines if convicted, even on a plea. That alone shows him to be a risk of flight. He also has shown himself incapable of complying with conditions of release. He violated his supervised release in the most profound way by committing the instant charges. His criminal history also has instances in which he received relatively lenient sentences but, due to his inability to stay out of trouble, resulted in probation revocations and the imposition of significant terms for violating his probation. In view of the coronavirus pandemic the government does not believe Probation should be called upon to install and monitor GPS bracelets, but the government does not believe that such monitoring would deter the defendant anyhow, given his history of convictions and drug abuse.

### COVID-19

The government agrees that the pandemic is a terrible scourge and that the risk of an inmate contracting the virus is greater than that of people in many other situations. That risk, however, must be weighed against the risk the defendant poses to the community, and the risk of his non-appearance, and that calculus weighs heavily in favor of detention.

The defendant argues that he is at significantly higher risk of contracting the virus and having a poor outcome in light of his asthma, hypertension, and obesity. Interestingly, according to a recent article from the New York Times attached as Exhibit C, the early evidence from New York City is that asthma had not been among the top ten factors for risk either of infection or having a poor outcome if infected.

With respect to the defendant in particular, undersigned counsel was advised today by the Chief of Security at Wyatt that the defendant is housed in H-pod.  The detainee who was the first to test positive for COVID-19 was in H-pod for approximately 24 hours from April 16, 2020 to April 17, 2020, on which date he was transferred to a different unit for a non-medical reason.  He did not complain of not feeling well until two days later, on April 19, 2020.  Otherwise no detainees housed in H-pod have complained of symptoms, and the detainee who was in H-pod briefly was not there when he complained of symptoms.  So far approximately 170 detainees in other units have been tested: of that total 13 have tested positive and only two have been symptomatic.

The government does not mean to diminish the devastation that the coronavirus has visited on individuals and families to date, and it is far from clear when it will end.  But it does appear that the defendant is receiving treatment for his asthma.  It also is not at all clear that being released to live in Chelsea is going to be an improvement for the defendant, given that Chelsea essentially is currently the hotspot for the coronavirus in Massachusetts.  And if Wyatt truly is as bad as the defendant suggests (a premise the government does not accept), the defendant could be endangering his mother's health were it to prove that he is an asymptomatic carrier of the virus.

But the bottom line is that, unfortunately, the defendant has shown himself through his own conduct to be too great a risk for release, even in light of the pandemic.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.  In the event the Court is not persuaded, the government respectfully requests that the Court stay its order to enable the

government to appeal such decision to the district court.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:   /s/Robert E. Richardson
      ROBERT E. RICHARDSON
      Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

Suffolk, ss.:        Boston, Massachusetts
        May 4, 2020

      I, Robert E. Richardson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/Robert E. Richardson
        ROBERT E. RICHARDSON